307 S.E.2d 603

**Karen ILOSKY**

v.

**MICHELIN TIRE CORP.**

No. 15710.

Supreme Court of Appeals of
West Virginia.

July 5, 1983.

Rehearing Denied Oct. 20, 1983.

Schrader, Stamp, Byrd, Byrum, Johnson & Companion, Frederick P. Stamp, Jr., William D. Wilmoth and Yolonda G. Lambert, Wheeling, John M. Kenney, Garden City, N.Y., Bachmann, Hess, Bachmann & Garden, John B. Garden and Paul T. Tucker, Wheeling, for appellant.

Zagula & Hill, E.A. Zagula and Barry M. Hill, Weirton, for appellee.

McGRAW, Chief Justice:

This is an appeal from a final judgment of the Circuit Court of Hancock County which awarded the appellee, Karen M. Ilosky, $500,000 in compensatory damages for injuries she suffered in an automobile accident. The appellant is Michelin Tire Corp. (Michelin), a tire distributor. Ferguson Tire Service Co. (Ferguson), a defendant below with Michelin, has not appealed the judgment, but has filed a brief as an appellee asking the Court to affirm the lower court's judgment.[1]

The facts in this case span a lengthy period of time. In June, 1974, Edward Ilosky, Karen's father, purchased a 1966 Ford Mustang from a neighbor for his daughter to drive to work. At this time, Karen was 22 years old. Mr. Ilosky took the automobile for a test drive before he purchased it. At the time of purchase, the automobile was equipped with Michelin radial tires on the rear axle and either radial or conventional tires on the front axle.

At his daughter's request, Mr. Ilosky took the automobile to Ferguson's October 22, 1974, to purchase snow tires and to have them mounted on the rear axle. Mr. Ilosky purchased two recapped conventional snow tires and a Ferguson employee mounted them on the rear axle. At Mr. Ilosky's direction, the employee moved the radial tires on the rear axle to the front axle because the rear tires carried more tread than the front tires. As a result, the automobile was then equipped with radial tires on the front axle and conventional tires on the rear axle. Ferguson's employee did not advise Mr. Ilosky that mixing tire types in this manner was not recommended or that it could create a driving condition which could result in injury.

After purchasing the snow tires, Mr. Ilosky then met his daughter at her dentist's office, a short distance away. They ex-

changed automobiles so that Karen could drive her vehicle to her job. During the drive, the appellee was traveling at between 20 and 30 miles per hour when she began to move from the left to the right lane of W.Va. 2 near Follansbee, W.Va.[2] At the same time or shortly afterwards, the appellant entered a curve in the highway. At that point, the appellee was unable to control her automobile, and it left the highway, crashing into a utility pole and splitting in two parts. When rescue personnel arrived, they found Karen trapped in the automobile.

As a result of the accident, doctors amputated Karen's right leg. She also suffered a fractured pelvis and other injuries. She required hospitalization for more than four months and required subsequent surgery on her injured leg. Karen also underwent skin graft surgery which left scars on her abdomen and thighs.

The appellee filed suit against Michelin and Ferguson claiming they were responsible for her injuries. She sued on two theories. First, the appellee claimed that both Michelin and Ferguson had been negligent in not providing warnings to Mr. Ilosky about the dangers of mixing the tires and in having the tires mixed by Ferguson. Second, she alleged that the failure to provide an adequate warning of the dangers of mixing constituted a defect which made the radial tires unreasonably dangerous, and therefore subjected Michelin to strict liability.[3] The trial judge permitted the jury to consider both theories, but struck the appellee's claim for punitive damages from the complaint.

At trial, the primary question concerned the cause of the accident. The appellee claimed that the use of radial tires on the front axle and conventional tires on the rear axle caused the automobile to "overs-

---

1. Since the Court is affirming the lower court's judgment against Michelin, we need not discuss any issues raised by Ferguson since its position depended on our disposition of the appellant's contentions.

2. This description of the events prior to the accident is taken from the appellee's testimony

on direct examination. In a deposition prior to trial, she did not mention the lane change.

3. Using the appellee's logic, she presumably could have sued Ferguson for manufacturing conventional tires and for not warning of the dangers of mixing them with radial tires.

teer."[4] This condition, coupled with the normal gravitational forces generated by Karen's changing lanes near or in a curve, resulted in loss of control of the vehicle which led to the accident. The appellee presented expert testimony on this point.

In rebuttal, Michelin and Ferguson presented expert testimony which indicated that "oversteering" would not be a problem at the speed at which Karen had been traveling prior to the accident. A defense witness also testified that he believed that the automobile's frame had severely rusted prior to the accident, and that it had separated just as Ilosky was in the curve. In his opinion, the loss of control resulted from the separation of the frame and not "oversteering."

The testimony also established that the Michelin tires did not carry a warning about mixing tire types, and that the company had been aware for decades of the dangers. Michelin had undertaken a campaign against mixing radial and conventional tires and its literature recommended against such use. This literature, however, only went to direct purchasers and not to persons such as the appellee who purchased a used car equipped with Michelin radials. As for Ferguson, the evidence showed that although it was not a Michelin dealer, it sold radials and had been advised by its tire suppliers of the danger of mixing tire types. The company's owner testified that he had not read literature distributed by the industry on mixing radials and was unaware personally of the dangers. The evidence showed that although Mr. Ilosky had directed that the radials be moved to the front axle, no Ferguson employee told him that such a maneuver was not recommended. He did not know of any dangers from such use.

The jury returned a verdict of $500,000 in compensatory damages for the appellee. It made specific findings that Michelin bore 75 percent of the fault, and that Ferguson bore 25 percent of the fault. The jury also found that Mr. Ilosky was not guilty of negligence in directing that the radial tires be placed on the front axle.

Michelin presents numerous assignments of error. Generally speaking, these claimed errors can be grouped into three categories: liability, damages and evidence.[5]

In the first category, Michelin claims that the trial court incorrectly charged the jury by including an instruction which contained an overly broad definition of defect. Finally, Michelin claims that the appellee's evidence did not establish that use of radial and conventional tires caused the accident and the appellee's injuries. Additionally, the appellant claims the lower court erred by permitting Ilosky to proceed upon both negligence and strict liability causes of action when the case was submitted to the jury.

As for damages, the appellant contends that the appellee failed to establish that she will be unable to work for the rest of her life. Consequently, the jury's verdict is excessive and not supported by the evidence. Moreover, the appellant claims that it should have been permitted to cross-examine the appellee's economist on collateral sources of income. Michelin contends that the lower court erred in computing prejudgment interest on money actually expended by the appellee prior to trial. Michelin also believes that the appellee's counsel made an improper "per diem" argument during his closing remarks to the jury.

---

4. Max Nonamaker, the appellee's tire design expert, explained "oversteering" at trial.

A. Well, it leads to what they refer to as an oversteer or it involves a slip angle that the bias retreaded mud and snow tire will tend to slip as it goes through the curve which is in the rear position on the vehicle while the Michelin worn radial tire tends to grip and this just causes the vehicle to go out of control.

5. Michelin makes two assignments of error which are without merit and which will not be discussed further. The appellant contends that the trial court erred in rulings made during jury selection. Additionally, the appellant argues that the trial court erred in refusing to submit a "state of the art" instruction to the jury.

In the third category, Michelin argues that the trial court improperly permitted the appellee's expert to testify as to the cause of the accident and to the adequacy of the appellant's attempts to warn about using a mixed tire combination. The appellant also contends that the lower court abused its discretion by refusing to view and to admit as evidence videotapes of tests performed by the appellant in an automobile similar to the one driven by Ilosky at the time of the crash. Finally, the appellant argues that the trial court erred when it refused to grant a mistrial when the appellee and her father testified to matters which had been excluded upon the appellant's two motions in limine.

The appellee has assigned as error the trial court's refusal to allow the jury to consider awarding punitive damages against either or both of the defendants below.

## I

### A.

The starting point of our inquiry must be to determine whether Michelin is subject to the appellee's strict liability cause of action. The appellee's theory of the case is based on *Morningstar v. Black & Decker Mfg. Co.*, 162 W.Va. 857, 253 S.E.2d 666 (1979), in which West Virginia adopted strict liability.

> In this jurisdiction the general test for establishing strict liability in tort is whether the involved product is defective in the sense that it is not reasonably safe for its intended use. The standard of reasonable safeness is determined not by the particular manufacturer, but by what a reasonably prudent manufacturer's standards should have been at the time the product was made.

Syllabus Point 4, *Morningstar, supra.*

Although we noted in *Morningstar* that products liability cases require a case-by-case analysis, we provided a general outline to be followed. "[T]he cause of action rests in tort, and ... the initial inquiry, in order to fix liability on the manufacturer, focuses on the nature of the defect and whether the defect was the proximate

cause of plaintiff's injury." *Id.* 162 W.Va. at 888, 253 S.E.2d at 682. The appellant challenges both the jury's conclusion that a defect existed, and that the defect was the proximate cause of the appellee's injuries.

The appellant does not dispute that failure to warn or to provide an adequate warning can amount to a defect which triggers strict liability in tort. In *Morningstar*, we stated that "a defective product may fall into three broad, and not mutually exclusive, categories: design defectiveness; structural defectiveness; *and use defectiveness arising out of the lack of, or the adequacy of, warnings, instructions, and labels.*" *Id.* (emphasis added). We noted that in use defectiveness, "the focus is not so much on a flawed physical condition of the product, as on its unsafeness arising out of the failure to adequately label, instruct, or warn." *Id.* Use defectiveness covers situations when a product may be safe as designed and manufactured, but which becomes defective because of the failure to warn of dangers which may be present when the product is used in a particular manner.

■ This case fits the use defectiveness category. The appellee does not claim that the Michelin radials were manufactured or designed in a defective manner. Rather, the appellee claims that when radials are used in combination with conventional tires in certain instances, they become dangerous, and that the manufacturer or other responsible party has a duty to warn of the danger and its potential consequences.

■ For the duty to warn to exist, the use of the product must be foreseeable to the manufacturer or seller. "The question of what is an intended use of a product carries with it the concept of *all those uses* a reasonably prudent person might make of the product, having in mind its characteristics, warnings and labels." 162 W.Va. at 889, 253 S.E.2d at 683 (emphasis added). The Oklahoma Supreme Court has succinctly explained the concept of foreseeable use in strict liability cases.

> Foreseeability as applied to manufacturer's products liability is a narrow issue. A manufacturer must anticipate all fore-

seeable uses of his product. In order to escape being *unreasonably* dangerous, a *potentially* dangerous product must contain or reflect warnings covering all foreseeable uses. These warnings must be readily understandable and make the product safe.

*Smith v. United States Gypsum Co.*, 612 P.2d 251, 254 (Okl.1980).

 The jury concluded that the appellee's use of the radial tires was a foreseeable use. We agree. The evidence at trial showed that Michelin had been aware of the hazards created by mixing radial and conventional tires in the manner utilized by the appellee. The company had taken steps to warn against such use. The tire industry itself recommended against such practice. Mixing radial and conventional tires has been outlawed in Great Britain, and radials are sold only in sets of four in France. Both these actions presumably have been taken to prevent mixing tire types. Therefore, the appellee's use of the tires was foreseeable, and the appellant was under a duty to warn of the hazards associated with such use.

Having established that a strict liability cause of action could be maintained against Michelin, we must decide whether the appellee proved her case. As discussed previously, the appellee had to show that a defect existed which made the product not reasonably safe, and that the defect was the proximate cause of her injuries. *Morningstar, supra.*

Michelin argues that the jury was erroneously instructed on what effort it had to make to satisfy the warning requirement. The jury was instructed that the appellant had a duty to adequately warn users of the risks associated with all foreseeable uses.[6] The jury also was instructed that if it concluded that ultimate users would not be warned by providing warnings to "middlemen" or could not receive an adequate warning by other means, then Michelin had a duty to affix a warning on the tires themselves.[7] At trial, the appellee concentrated her case on showing how a warning could be affixed on the tire itself at minimal cost and the lack of warning of dangers contained in literature distributed by Michelin.

The appellant contends that the jury was instructed that Michelin *had* to affix a warning on the tire as the only way to adequately warn tire users such as Karen Ilosky who do not purchase radial tires from an authorized dealer, but acquire them secondhand. We do not read the jury instructions in the same manner as does the appellant. The jury was not instructed that the *only* way to adequately warn was by affixing a warning on the product. Rather, it could reach that conclusion if it decided that other means would not adequately warn persons such as the appellee of the dangers of mixing tire types. The jury was also instructed that the seller or manufacturer had a duty to warn of dangers resulting from foreseeable uses, precisely the legal issue discussed in *Morningstar*.[8]

6. In this regard, the appellee's instruction read:
 The seller of a product has a duty to:
 1. Warn that the product, even if harmless or safe in itself, is, when mixed or used in conjunction with another product, dangerous or potentially dangerous to users, where it is reasonably foreseeable that uninformed users may mix the products.

7. The appellee's instruction read:
 2. Affix a warning of the dangers or potential dangers of using the product to the product itself where the danger is such that it is unreasonable to entrust conveyance of the warning to ultimate users by middlemen or where it is reasonably foreseeable that ultimate users will not receive an adequate warning if not affixed to the product itself.

8. Although Michelin does not argue this point, it would seem that Ferguson occupied a position analogous to an assembler who installs a defective component in a product. Ordinarily, such a person is required to inspect and test such a component. Annot., 3 A.L.R.3d 1016 (1965). Where the ultimate user of the product claims that the "defect" consists of a lack of adequate warnings or labels and the manufacturer can show that such warnings were given to the assembler and that the assembler utilized the component against the manufacturer's warnings, liability should fall on the assembler rather than the manufacturer. *Cf. Griggs v. Firestone Tire and Rubber Company*, 513 F.2d 851 (8th Cir.1975). *See* RESTATEMENT (SECOND) OF TORTS § 388 comment n; J. Sales, *The Marketing Defect (Warning and Instructions) In*

■ We stated in *Morningstar* that product unsafeness arising from failure to warn "is to be tested by what the reasonably prudent manufacturer would accomplish in regard to the safety of the product, having in mind the general state of the art of the manufacturing process, including design, labels and warnings, as it relates to the economic costs, at the time the product was made." 162 W.Va. at 888, 253 S.E.2d at 682–83. The determination of whether a defendant's efforts to warn of a product's dangers are adequate is a jury question. *Id. See also Stapleton v. Kawasaki Heavy Industries, Ltd.,* 608 F.2d 571, 573 (5th Cir.1979) (Ga. law) (cases cited); *Anderson v. Heron Engineering Co.,* 198 Colo. 391, 604 P.2d 674, 679 (1979).

■ As the appellee points out, the jury clearly considered the criteria listed in *Morningstar* and concluded that Michelin's efforts to warn did not meet the legal standard. The appellee presented evidence that Michelin had been aware of the dangers of mixing tires for decades. Michelin's own literature recommended against such use. Literature distributed by the tire industry recommended against such use. To demonstrate ways Michelin could have attempted to warn, the plaintiff presented evidence that a warning could have been incorporated into the tire design itself for a few cents per tire. The appellant contended at trial that such a warning would not be effective, but failed to convince the jury that the efforts it had made through literature and other means were sufficient to warn persons such as the appellee of the dangers of mixing tires. Given this, we cannot say that the jury's conclusion that Michelin failed to adequately warn was not supported by the evidence. We do wish to make clear, however, that we are not saying that the jury found that the only method to ensure an adequate warning was to incorporate it into the tire. Whether that would be an adequate warning was not the issue; the legal question

was whether Michelin's actual attempts at warning were legally sufficient.

Even if the jury was correct in finding that the tires were defective because of Michelin's failure to adequately warn, the appellee had to prove that the defect was the proximate cause of her injuries before she may recover from Michelin.

In her case-in-chief, the appellee's expert testified that the mixture of tires created a condition referred to in the tire industry as "oversteering." This condition comes about because different types of tires provide different amounts of traction on the road surface. Thus, the appellee's theory is that when she changed lanes in or near the curve, the difference in traction caused the rear end of her vehicle to "jerk" and for her to lose control of it. The loss of control resulted in the vehicle leaving the road and striking the utility pole.

In their case-in-chief, the appellant and Ferguson did not deny that "oversteering" may result from placing radial tires on the front axle and conventional tires on the rear axle. Rather, their expert testified that "oversteering" becomes a problem only at speeds greatly in excess of the 20–30 miles per hour the appellee testified she was traveling immediately prior to the accident. Therefore, "oversteering" could not have caused the accident.

In addition to rebutting the appellee's theory of causation, Michelin offered its own explanation. Its expert testified that the frame of the vehicle had severely rusted prior to the automobile's purchase by the appellee's father. The expert testified that the automobile frame had separated into two parts immediately prior to the accident, and that this separation caused the appellee to lose control of the vehicle and to strike the utility pole.

In her rebuttal, the appellee presented testimony which indicated that "oversteering" may be a problem at low speeds, given the presence of gravitational forces generated by the curve and by changing lanes.

*Strict Tort Liability,* in Practicing Law Institute, Product Liability of Manufacturers: Prevention and Defense 67 (1981). In the present case, there was evidence that Ferguson had received literature from tire manufacturers advising of the dangers of mixing radial and conventional tires, but that the company president had failed to read it.

Additionally, she presented expert testimony that the vehicle had not separated until after impact with the utility pole. Other witnesses testified that the vehicle had not been severely rusted at the time of the accident, but had become so only after sitting in a junk yard for years prior to inspection by the appellant's expert witness. Thus, the jury was given two distinct theories of causation of the appellee's accident and her injuries.[9]

We must determine if the evidence met the legal requirement for causation. Causation is a question of fact. The parties presented conflicting evidence on what caused the accident and the appellee's injuries. They each presented evidence to rebut the other's causation theory. "It is the peculiar and exclusive province of the jury to weigh the evidence and to resolve questions of fact when the testimony is conflicting." Syllabus Point 3, *Long v. City of Weirton*, 158 W.Va. 741, 214 S.E.2d 832 (1975). The jury chose to believe the appellee's causation theory over that of the appellant.

■ "It is the function of this Court to determine whether or not the verdict is supported by credible evidence, not to re-evaluate the evidence." *Id.* 158 W.Va. at 755, 214 S.E.2d at 844. The testimony at trial clearly was credible, and the jury was entitled to find for the appellee on the question of causation. The appellee offered expert testimony as to her theory of causation and to rebut the appellant's causation theory. She also presented testimony which indicated that the vehicle had been in good mechanical condition prior to the accident.

The appellant apparently contends that the appellee not only had to put forth evidence on her theory of causation, but also to disprove other possible causes of the accident. We disagree. In *Long*, we stated that "[r]ecognition of the rule requiring proof of causation does not impose upon the plaintiff a duty to exclude every other plausible theory as to the cause and effect of the accident." *Id.* 158 W.Va. at 762, 214 S.E.2d at 848. "[I]f there is evidence which

points to any one theory of causation, indicating a logical sequence of cause and effect, then there is a juridicial basis for such a determination, notwithstanding the existence of other plausible theories with or without support in the evidence." *Id., quoting City of Bessemer v. Clowdus*, 261 Ala. 388, 394, 74 So.2d 259, 263 (1954). The appellee's theory of causation was that the tire mixture created the hazard of "oversteering," that "oversteering" caused the appellee to lose control of her vehicle, and that the loss of control resulted in the accident and her subsequent severe injuries. This is a "logical sequence of cause and effect." The fact that other theories of causation may also be plausible does not prevent the jury from considering the appellee's theory. "[P]laintiff's failure to exhaust every possibility concerning causation merely goes to the weight of the testimony and not to its competency." 158 W.Va. at 763, 214 S.E.2d at 848.

■ Given the evidence offered by the appellee, the jury was entitled to find that the tires were defective because of inadequate warning of the dangers of mixing tires in the manner done in this case. Additionally, the evidence supported the appellee's theory of causation, and the jury was entitled to find that the defect proximately resulted in the appellee's injuries. Therefore, we must affirm the jury's finding of liability against the appellant Michelin premised on a strict liability in tort cause of action.

### B.

The appellee's complaint alleged alternative causes of action against Michelin. First, she claimed that Michelin's failure to adequately warn constituted a defect which resulted in her injuries; therefore, she was entitled to maintain a strict liability cause of action. Second, she alleged that Michelin had been negligent in failing to warn persons such as herself of the dangers of mixing radial and conventional tires. The appellee presented evidence at trial on both these causes of action. Michelin moved the

---

**9.** The question of whether the appellee's expert was qualified to give causation testimony is dis- cussed in section III–A of this opinion.

trial court to force the appellee to choose which theory she wished the jury to consider. The trial court denied Michelin's motion and permitted the jury to consider both theories of liability. The appellant assigns that ruling as error.

■ The trial court properly denied Michelin's motion. Product liability actions may be premised on three independent theories—strict liability, negligence, and warranty. Each theory contains different elements which plaintiffs must prove in order to recover. No rational reason exists to require plaintiffs in product liability actions to elect which theory to submit to the jury after the evidence has been presented when they may elect to bring suit on one or all of the theories.

In this jurisdiction, a plaintiff is entitled to a jury instruction on each cause of action supported by evidence. *State v. Hall,* 171 W.Va. 212, 298 S.E.2d 246 (1982). Once the appellee presented evidence on both theories, she was entitled to have the jury consider each ground asserted for relief. *Chavez v. Robberson Steel Corp.,* 94 Nev. 597, 584 P.2d 159 (1978); *Howes v. Deere & Co.,* 71 Wis.2d 268, 238 N.W.2d 76 (1976).

The appellant proposes that we restrain the common law development of the strict liability cause of action.

The cause of action covered by the term "strict liability in tort" is designed to relieve the plaintiff from proving that the manufacturer was negligent in some particular fashion during the manufacturing process and to permit proof of the defective condition of the product as the principal basis of liability.

*Morningstar,* 162 W.Va. at 878, 253 S.E.2d at 677. It is also designed to enable plaintiffs to avoid some of the affirmative defenses available in warranty actions. *Star Furniture Co. v. Pulaski Furniture Co.,* 171 W.Va. 79, 297 S.E.2d 854, 857 (1982). To permit plaintiffs to plead alternative causes of action, but to force them to choose one theory to submit to the jury after the taking of evidence would force some plaintiffs to forego the strict liability cause of action if they believed they had

stronger negligence or warranty cases. We decline to adopt this view of the law.

## II

### A.

The appellant's second category of assigned errors concerns the jury's award of $500,000 in compensatory damages. Michelin's primary argument on this point is that the appellee's evidence failed to establish that she would be permanently unemployed because of her injuries. Therefore, the testimony of appellee's economist, in which he calculated her lost earnings capacity on the basis of permanent unemployment, was not based on fact and should have been excluded from the jury.

" 'Future damages' are those sums awarded to an injured party for ... loss or impairment of earning capacity." Syllabus Point 2, in part, *Flannery v. United States,* 171 W.Va. 27, 297 S.E.2d 433 (1982); syllabus point 10, in part, *Jordan v. Bero,* 158 W.Va. 28, 210 S.E.2d 618 (1974). "The permanency or future effect of any injury must be proven with reasonable certainty in order to permit a jury to award an injured party future damages." Syllabus Point 9, *Jordan, supra.* Our task is to determine whether the appellee established with reasonable certainty that the future effect of her injuries would be permanent unemployment.

The appellee presented evidence from three physicians who treated her for ailments arising from the accident. Dr. Mikita testified that the appellee would be unable to perform manual labor or labor requiring her to stand on her legs for very long. Dr. Kyne testified that her amputation and the potential of arthritis in her hip socket injured in the accident would reduce her ability to pursue gainful employment. Dr. Greco testified that the appellee had become addicted to pain-killing medication and would remain so for the remainder of her life.

■ Additionally, the appellee testified that she had made two attempts to work after the accident. First, she had gone to school more than two years for nurse's

training. After she completed her classwork, she began her clinical training at a hospital. However, she testified that pain began to interfere with her job performance, and she was advised to resign in order to rest her leg. A year later, she began working in the nursing office of the Weirton Medical Center in a clerical position. Her supervisor there testified that her job performance had been good except for attendance problems caused by pain in her leg. The appellee testified that she resigned that position because of leg pain.

"Where an injury is of such a character as to be obvious, the effects of which are reasonably common knowledge, it is competent to prove future damages either by lay testimony from the injured party or others who have viewed his injuries, or by expert testimony, or from both lay and expert testimony, so long as the proof adduced thereby is to a degree of reasonable certainty."

Syllabus Point 11, in part, *Jordan, supra*. The appellee's loss of her leg and other injuries are obvious injuries; therefore, she was entitled to show the permanent effect of those injuries through expert and lay testimony, including her own testimony.

■ The appellee's evidence established with reasonable certainty that the appellee's injuries would prevent gainful employment in the future. The appellee showed that she is unable to return to her former employment at a manufacturing plant. Additionally, she has twice attempted to work in new fields, but each time has been forced to cease working because of her injuries. The appellant did not present evidence to rebut the appellee's expert testimony that her condition will worsen with time. It is unlikely that she will be able to return to work as time progresses if she cannot do so now. "[W]here the permanent injury is proven, reasonable inferences based upon sufficient evidence are all that is necessary to carry this question [loss of earnings capacity] to the jury for its consideration." 158 W.Va. at 57, 210 S.E.2d at 637. The jury had before it sufficient evidence to establish the future effects which would result from the appellee's permanent injuries.

Since the appellee met the reasonable certainty standard, the economist's testimony was properly admitted into evidence. The calculations made by the economist were not binding upon the jury nor was the jury required to award damages based upon a finding that the appellee would never work again. That the jury did not consider the economist's testimony as absolute is reflected by the fact that it returned a $500,000 verdict for *all* damages while he testified that the appellee's lost earning capacity *alone* was $686,380.

■ Having determined that the appellee did show the future consequences of her permanent injuries with reasonable certainty, we must dismiss the appellant's contention that the judgment was excessive. "Courts must not set aside jury verdicts as excessive unless they are monstrous, enormous, at first blush beyond all measure, unreasonable, outrageous, and manifestly show jury passion, partiality, prejudice or corruption." Syllabus, *Addair v. Majestic Petroleum Co.*, 160 W.Va. 105, 232 S.E.2d 821 (1977). The appellee presented evidence to support a verdict of $500,000 in compensatory damages.

### B.

Next, the appellant makes a narrow collateral source doctrine argument. Michelin attempted to cross-examine the appellee's economist on what expenses the appellee had actually paid for between the time of injury and trial, and what expenses had been paid for by other sources, such as insurance. The appellant's strategy was to limit the award of prejudgment interest to expenses actually paid by the appellee.

Simply put, the collateral source rule excludes payments from other sources to plaintiffs from being used to reduce damage awards imposed upon culpable defendants. The rule is premised on the theory that it is better for injured plaintiffs to receive the benefit of collateral sources in addition to actual damages than for defendants to be able to limit their liability for damages merely by the fortuitous presence of these sources. We have recognized the collateral source rule in a variety of con-

texts. *See, e.g., Ellard v. Harvey*, 159 W.Va. 871, 231 S.E.2d 339 (1976) (sick leave); *Jones v. Laird Foundation, Inc.*, 156 W.Va. 479, 195 S.E.2d 821 (1973) (workmen's compensation).

 Prejudgment interest is allowed in personal injury actions when certain expenditures "can be rendered certain by calculation and when those elements represent a direct pecuniary loss to the injured party ..." *Bond v. City of Huntington*, 166 W.Va. 581, 276 S.E.2d 539, 547 (1981). W.Va.Code § 56–6–31 (1982 Supp.) also authorizes recovery of interest from the date the cause of action accrued for special or liquidated damages. "Special damages include lost wages and income, medical expenses, damages to tangible personal property, and similar out-of-pocket expenditures, as determined by the court." *Id.*

"The basis of this rule is that interest on these elements serves to compensate for the loss of the use of funds that have been expended." 166 W.Va. at 597, 276 S.E.2d at 547. Such damage elements "include hospital, medical, drugs, rehabilitation and like expenses that have been incurred by the injured party prior to the time of the trial." *Id.*

 The appellant's position is that it should not be held liable for prejudgment interest on expenses which the appellee did not actually incur because she then did not actually lose the use of funds. However, we believe that induction of collateral sources into the jury's consciousness for whatever purpose is to be avoided. The purpose of the collateral source doctrine is to prevent reduction in the damage liability of defendants simply because the victim had the good fortune to be insured or have other means of compensation. There is always the danger that jury exposure to sources of collateral payments will cause it to award less than actual damages, thereby allowing defendants to reduce their liability. Regardless of who pays the bill for expenses prior to trial, someone is losing the use of that money. Injured plaintiffs should not have to forego the collateral source rule merely to recover prejudgment interest. The trial court's calculation of

the prejudgment interest awarded the appellee was not improper.

### C.

 Michelin's final damages-related argument is that the appellee's counsel suggested a "per diem" formula during his closing remarks to the jury. Such suggestions are not permitted in West Virginia.

> In an action for damages for personal injuries, an argument of counsel to the jury based on a mathematical formula, or fixed-time basis, suggesting a money value for pain and suffering is not based on facts, or reasonable inferences arising from facts before the jury, and constitutes reversible error.

Syllabus Point 5, *Crum v. Ward*, 146 W.Va. 421, 122 S.E.2d 18 (1961).

In *Crum,* plaintiff's counsel suggested a formula to the jury for it to use in calculating damages for plaintiff's pain and suffering. The formula included specific monetary amounts for specific time periods— $100 per day for 15 days; $25 per day for 301 days; $3 per day for 12,676 days.

In this case, the appellee's counsel specified the time which had elapsed from the time of injury to trial, and the time which would pass if the appellee lived her life expectancy. Thus, counsel told the jury that the appellee had lived with pain for 7 years, 1 month and 19 days from the day of the accident to the day of closing argument. He then proceeded to calculate this period as 2,600 days or 62,500 hours. He told the jury that the appellee had a life expectancy of 50 years after the trial's conclusion. That translated into 18,250 days or 440,000 hours. Shortly after giving the jury these figures, counsel stated that "the facts of this case, ladies and gentlemen, cry out for a multi-million dollar verdict ...."

 Michelin argues that the combination of specific units of time and the suggestion of a multi-million dollar verdict constitute a "per diem" argument. Unlike counsel in *Crum*, the attorney did not suggest a fixed value to be assigned to a specified unit of time. In fact, he did not

even suggest one specific time unit to use. Rather, counsel provided the jury with figures as to the amount of time which jury members could have readily calculated themselves had they so desired. The fact that the attorney tried to emphasize the appellee's suffering by using smaller and smaller units of time is not by itself improper.

■ Additionally, counsel's suggestion of the amount of the award was not so specific as to constitute an improper jury argument. The appellee had presented evidence that she faced lost earning capacity in excess of $686,000. Additionally, she had already incurred extensive medical and other expenses and faced the prospect of more medical treatment as she grew older. Other damages included lost earnings from the time of injury to trial and past and future pain and suffering. Although the evidence reasonably supported the counsel's suggested award, the jury apparently was not swayed since it returned a verdict for $500,000. We do note, however, that counsel generally must be careful that closing remarks are supported by the evidence and that they do not unduly emphasize units of time and relate specific dollar amounts to them.

## III

### A.

Michelin's third category of assigned errors revolves around alleged incorrect evidentiary rulings made by the trial court. The first claimed error is that the trial court improperly permitted the appellee's expert, Max Nonamaker, to testify as to the cause of the accident and to the adequacy of Michelin's efforts to warn the public about the dangers of mixing radial and conventional tires. The appellant's argument concerning Nonamaker's testimony as to causation is related to its previous contention that the appellee failed to prove causation.[10] Here, however, Michelin argues that Nonamaker was not qualified to give his opinion as to causation.

10. See section I–A of this opinion.

■ The appellee qualified Nonamaker as an expert in tire design and tire performance. He testified generally about why the mixing of radial and conventional tires created a driving hazard and the chance of injury. In response to a hypothetical question which reflected the basic events leading up to the accident, he gave his opinion that the tire mixture had caused the appellee to lose control of her vehicle and to crash into the utility pole. The appellant claims that only an accident reconstruction specialist could have given such testimony, and that Nonamaker was not qualified in this field. Additionally, Michelin contends that in formulating his opinion, Nonamaker failed to consider other potential causes; therefore, his opinion did not have a proper basis and should have been excluded.

As noted previously, the record indicates that the appellee qualified Nonamaker as an expert in tire design and the effects on vehicle operation of mixing tire types. As such, he was familiar with what could occur when tire types were mixed. Therefore, he was qualified to give his opinion, based on the facts as presented in the hypothetical question, that the mixture had resulted in "oversteering" which had in turn resulted in the appellee's accident and her injuries. As for the fact that Nonamaker failed to consider other causes of the accident, that "omission" goes to the weight of his testimony, not its competence. *Long,* 158 W.Va. at 763, 214 S.E.2d at 848.

■ Our decision in *Morningstar* disposes of the appellant's point concerning Nonamaker's ability to testify as to the adequacy of Michelin's efforts to warn the public about mixing tires.

In a products liability case, the expert witness is ordinarily the critical witness. He serves to set the applicable manufacturing, design, labeling and warning standards *based on his experience and expertise in a given product field.*

Through his testimony, the jury is able to evaluate the complex technical problems relating to product failure, safety devices, design alternatives, the adequa-

cy of warnings and labels, as they relate to economic costs.

*Morningstar,* 162 W.Va. at 887, 253 S.E.2d at 682.

Although the question of the adequacy of a warning is one of fact to be determined by the jury, experts may testify on such matters in their fields of expertise. *Morningstar, supra; see also Smith,* 612 P.2d at 257. In this case, Nonamaker could testify as to the adequacy of warnings as they related to informing ultimate tire consumers of the potential dangers of using radial and conventional tires together.

### B.

Michelin's second evidentiary argument concerns the admissibility of videotapes it made of certain tests conducted by the appellant with a 1966 Ford Mustang. The appellant had conducted these tests after attempting to make the vehicle as similar as possible to that driven by the appellee at the time of the accident. At an *in camera* hearing, the trial court listened to testimony by the appellant's and appellee's expert witnesses as to the validity of the tests. The trial court did not view the videotapes before ruling them inadmissible.

There are three videotapes and three tests at issue. The first videotape recorded a test conducted in a parking lot near Michelin's corporate headquarters at Lake Success, New York. This test was designed to measure the amount of "oversteering" or "understeering" a vehicle similar to the appellee's in construction and equipment would undergo. The second videotape showed the vehicle being driven from New York to West Virginia at highway speeds and conditions. The third videotape showed the automobile being driven along the route taken by Karen Ilosky the day of the accident.

In *Spurlin v. Nardo,* 145 W.Va. 408, 114 S.E.2d 913 (1961), we stated the general rule governing admissibility of evidence of tests.

> In order for evidence of tests or experiments to be admissible, the essential conditions at the time of the experiment must be substantially similar to those existing under the occurrence, but it is not necessary that the conditions be identical in every respect.

Syllabus Point 6, *Spurlin, supra.* We also stated that the admission of evidence of tests or experiments is usually within the sound discretion of the trial court. *Id.* 145 W.Va. at 419, 114 S.E.2d at 920. Consequently, we must determine whether the trial court acted within its discretion in excluding the videotapes.

The trial court excluded the parking lot test videotape because the appellant failed to give the appellee's counsel an opportunity to be present during the test. However, the trial court allowed the appellant's expert to testify before the jury regarding the test's purpose, the manner in which it was conducted and its results.

■ The trial court erred in refusing to admit the videotape of the parking lot test. In *State v. Newman,* 101 W.Va. 356, 132 S.E. 728 (1926), the Court stated that "[t]he proper admission of evidence of experiments is not limited to those made in the presence of the accused ...." *Id.* 101 W.Va. at 365, 132 S.E. at 731. If the named party need not be present, then the party's counsel need not be present at the time the test is conducted.

We do not hold the trial court's error prejudicial because the court permitted the appellant's expert to testify before the jury. The trial court's ruling did not prevent the appellant from presenting evidence of the test; it merely restricted the manner in which the evidence could be presented. Therefore, it was harmless error. W.Va.R.C.P. 61 (1982 Rep.Vol.).

■ The trial court excluded the remaining tests because the appellant failed to meet its burden of proof in showing that the test was performed under all the "essential conditions." In the second test, the appellant equipped the Mustang with regular conventional tires rather than snow tires such as had been on the appellee's vehicle. The type of tire certainly was an essential condition in this case, and the trial court properly refused to admit evidence of the test.

The third test presents a more difficult question. The appellant videotaped its expert driving the Mustang along the route traveled by the appellee the day of the accident. Additionally, it videotaped a woman of the same age and driving experience as the appellee driving the vehicle along the appellee's route to work. The appellant's expert testified *in camera* that the test duplicated all essential conditions. The appellee's expert testified as to why differences between the test vehicle and the Ilosky Mustang, and differences in road conditions at the time of the test and the accident made the test invalid.

■ These differences included different types of shock absorbers on the vehicles, the lack of specific knowledge as to the air pressure in the Ilosky vehicle's tires the day of the accident, the presence of construction activity along the highway the day of the test, the fact that the test did not include a lane change which the appellee had testified she made immediately prior to the accident, and the possibility that gravel was on the highway the day of the accident. The appellee had the burden of showing that these differences did not prevent the test conditions from being "substantially similar" to those existing at the time of the accident. The trial court had evidence before it that these conditions could materially affect the test's results. Therefore, we cannot say that the trial court abused its discretion in refusing to admit the videotape of the third test.

Michelin's final evidentiary point revolves around testimony given by the appellee and her father which allegedly violated two motions in limine proposed by the appellant and granted by the trial court.

Prior to trial, the appellant moved the trial court to exclude any testimony regarding the fact that the appellee had been given last rites after the accident. During the direct examination of the appellee, she testified that she had received last rites. The question asked did not concern whether she had been given last rites; therefore, it was an unresponsive answer. Appellant's counsel did not object at that time,

but moved for a mistrial the next day of trial.

■ The appellee clearly violated the court's ruling which prohibited testimony regarding last rites. *See, e.g., Cody v. Mustang Oil Co.,* 595 S.W.2d 214, 216 (Tex. App.1980). In this case, however, we do not sense from the record that the appellee's reference was so prejudicial to the appellant as to "cause the rendition of an improper judgment." *Id.* at 215, *citing Pittman v. Baladez,* 158 Tex. 372, 312 S.W.2d 210 (1958).

While we would prefer that it be, the conduct of a civil trial does not have to be perfect in order to be affirmed on appeal. Rule 61, W.Va.R.C.P., states that

No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

This Court has consistently adhered to the doctrine of harmless error, and we believe it is applicable to this case. "Errors that are harmless or do not affect the substantial rights of the parties do not require reversal." *Jennings v. Smith,* 165 W.Va. 791, 272 S.E.2d 229, 231 (1980) (per curiam). Consequently, the trial court did not err in denying the appellant's motion for a mistrial based on the appellee's testimony.

Prior to trial, the trial court also granted Michelin's motion in limine to prohibit the appellee's father from testifying as to what a tire recapper had told him regarding how mixing radial and conventional tires had caused or could have caused his daughter's accident. Mr. Ilosky testified that he called the former owner of the vehicle to inquire about what kinds of tires had been

on the vehicle at the time of sale. He further testified that he made this telephone call after visiting a junk yard where his daughter's vehicle had been taken after the accident and after talking with individuals there. He did not testify as to the content of those conversations. In response to a question regarding his conversation with the former owner of the Mustang, he stated that he "learned you can't mix radials with conventional tires." Michelin moved for a mistrial, arguing that this statement violated the motion in limine because it went to the cause of the accident.

■ The trial court properly denied Michelin's motion for a mistrial. First, the appellant's motion in limine went only to conversations had with a tire recapper, not the vehicle's former owner. Second, numerous witnesses testified as to the undesirability of mixing tires. That was the substance of Mr. Ilosky's testimony. Testimony as to causation of the accident would have required Mr. Ilosky to say that the owner had told him that mixing tire types could or did cause the accident.

### IV

Having addressed the appellant's assignment of errors, we now turn to the appellee's claim that the trial court incorrectly struck her claim for punitive damages from the complaint.

Punitive or exemplary damages are such as, in a proper case, a jury may allow against the defendant by way of punishment for willfulness, wantonness, malice, or other like aggravation of his wrong to the plaintiff, over and above full compensation for all injuries directly or indirectly resulting from such wrong. Syllabus Point 1, *O'Brien v. Snodgrass*, 123 W.Va. 483, 16 S.E.2d 621 (1941).

Syllabus Point 4, *Harless v. First National Bank in Fairmont*, 169 W.Va. 673, 289 S.E.2d 692 (1982); *see also* Syllabus Point 1, *Wells v. Smith*, 171 W.Va. 97, 297 S.E.2d 872 (1982).

■ The trial court correctly struck the appellee's claim for punitive damages. The evidence showed that Michelin had taken steps to warn the public about mixing radi-

al and conventional tires. These efforts included placing warnings and recommendations against such action in literature distributed to consumers and to individual dealers who carried Michelin brand tires. The fact that these warnings may have been inadequate to fully warn of the hazards of such use does not obviate the fact that Michelin made some effort. This case does not involve a situation where the manufacturer or distributor made *no* effort to warn about use of the product. Therefore, the facts do not meet the willfulness, wantonness, or malice standard.

### V

The appellant's case at trial consisted of rebutting the appellee's case-in-chief and presenting its own theories as to how and why the accident occurred. On appeal, our review of the jury's findings on these questions is limited.

"In determining whether the verdict of a jury is supported by the evidence, every reasonable and legitimate inference, fairly arising from the evidence in favor of the party for whom the verdict was returned, must be considered, and those facts, which the jury might properly find under the evidence, must be assumed as true."

Syllabus Point 17, *Jordan v. Bero*, 158 W.Va. 28, 210 S.E.2d 618 (1974); Syllabus Point 5, *Poe v. Pittman*, 150 W.Va. 179, 144 S.E.2d 671 (1965); Syllabus Point 3, *Walker v. Monongahela Power Company*, 147 W.Va. 825, 131 S.E.2d 736 (1963). We will not invade the jury's fact-finding function on appeal. We conclude that the jury had sufficient evidence to support its findings of liability and damages.

For the foregoing reasons, the judgment of the Circuit Court of Hancock County is affirmed.

Affirmed.